Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

December 15, 2020

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO.**   **4:20-cr-674** |
| | § | |
| **JOYCE AGU,** | § | |
| **Defendant** | § | **UNDER SEAL** |
| | § | |

## INDICTMENT

THE GRAND JURY CHARGES:

### A.  INTRODUCTION

At all times material to this Indictment:

### THE MEDICARE PROGRAM

1. The Medicare program ("Medicare") was a federally funded health insurance program that provided health care benefits to certain individuals, including the elderly, blind, and disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS") an agency of the United States Department of Health and Human Services ("HHS").  Individuals who received benefits under Medicare were often referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3. Medicare was comprised of four different parts.  Medicare Parts A and B were applicable to this case.  Medicare Part A, also known as hospital insurance, covered inpatient hospital care and home health care services.  The Hospital Insurance Trust Fund paid for Medicare Part A benefits.  The money deposited into the Medicare Trust Fund included payroll taxes from

1

employees, employers and self-employed people, funds authorized by congress, and premiums. The Trust Fund was held by the United States Treasury. Medicare Part B helps pay for physician services, outpatient hospital services, medical equipment and supplies, ambulance transportation services and other health care services and supplies. Services provided by home healthcare agencies ("HHA") to beneficiaries requiring services at home because of an illness or disability causing them to be homebound are covered by Medicare Part A. Payments for home healthcare services were typically made directly to the HHA, rather than to the beneficiaries receiving the services.

4. Physicians, clinics, and other healthcare providers, including HHAs that provided services to Medicare beneficiaries, were required to apply for a Medicare "provider number" in order to submit claims for payment. Each Medicare claim contained the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered or provided the services.

5. CMS did not directly pay Medicare Part A claims submitted by Medicare certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.

6. The Medicare program paid for home health services only if the beneficiary qualified for home healthcare benefits. A patient qualified for home healthcare benefits only if:

    a. the patient was confined to the home, also referred to as homebound;

    b. the patient was under the care of a physician who specifically determined there was a need for home healthcare and established a Plan of Care ("POC"); and

    c. the determining physician signed a certification statement specifying that:

    i.   the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy;

    ii.   the beneficiary was confined to the home;

    iii.   a POC for furnishing services was established and periodically reviewed; and

    iv.   the services were furnished while the beneficiary was under the care of the physician who established the POC.

7. Medicare regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the HHA.

## THE DEFENDANT

8. JOYCE AGU, defendant herein, was an owner of DHS Healthcare, Inc. ("DHS"), Nutrend Healthcare, Inc. ("Nutrend") and was a resident of Sugar Land, Texas in the Southern District of Texas.  DHS and Nutrend had offices location in Houston, Texas.

## B.  COUNT ONE
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. §1349)

9. Paragraphs 1 through 8 of this Indictment are realleged and incorporated as though fully set forth therein.

## THE CONSPIRACY

10. Beginning in or about September, 2009 the exact time being unknown and continuing thereafter to in or about August, 2017, in the Houston Division of the Southern District of Texas and elsewhere, defendant

**JOYCE AGU**

did knowingly, intentionally, and willfully combine, conspire, confederate and agree with other persons known and unknown to the grand jury to commit and aid and abet certain offenses against the United States; namely

    a.  to knowingly and willfully execute and attempt to execute, a scheme and artifice: (1) to defraud a health care benefit program; namely the Medicare and Medicaid program; and (2) to obtain, by means of material false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, the health care benefit programs; in connection with the delivery of and payment for health care benefits, items and services, in violation of Title 18, United State Code Section 1347.

## OBJECT OF THE CONSPIRACY

11. The objective of the conspiracy was to unlawfully enrich the defendant by submitting false and fraudulent claims to Medicare for home health services and procedures whereby the beneficiaries were not properly qualified; and that were not provided to Medicare beneficiaries as billed.

## MANNER AND MEANS

The manner and means of the conspiracy included but was not limited to the following:

12. Defendant JOYCE AGU would and did own DHS.

13. On or about April 26, 2010, the defendant JOYCE AGU would and did sign the Medicare Enrollment Application for DHS indicating that she understood all the rules and regulations and would not bill Medicare for false claims.

14. N.G. was the owner of Gregorio Healthcare, a medical clinic in Houston, Texas. From October 2015 through October 2016, N.G. provided JOYCE AGU with the required paperwork to bill Medicare for home health agencies, which included DHS, for beneficiaries in the Houston and other known surrounding areas in Texas. Any patient authorized to receive home health by JOYCE AGU's clinic was the result of a kickback from JOYCE AGU. N.G. received between $70 to $120 per patient via check from JOYCE AGU for the initial certification of home health or for the recertification of home health for a beneficiary.

15. N.G., who is not a licensed physician, would conduct a medical evaluation of the beneficiary to establish a plan of care. The plan of care would generate a 485, to which N.G., would have PHYSICIAN 1 sign the 485, certifying and recertifying beneficiaries for home health with DHS from on or about October 2015 through on or about October 2016.

16. From on or about March 2014 to on or about August 2015, DHS issued checks to QC Medical Clinic ("QC") to provide JOYCE AGU with the required paperwork to bill Medicare for home health agencies, which included DHS, for beneficiaries in the Houston, Texas and the surrounding areas. PHYSICIAN 2, who worked and was paid by QC, signed plans of care and 485s certifying and recertifying beneficiaries for home health with DHS.

17. S.B. was a clinic manager at Milten's Clinic where Physician 2 also signed 485s. DHS paid S.B. for the 485s.

18. Defendant JOYCE AGU would and did bill Medicare on behalf of DHS for home health services to beneficiaries where they did not qualify or did not receive them.

19. From January 2012 to August 2017, DHS submitted or caused to be submitted claims to Medicare in excess of $2.3 million and was paid approximately $2.7 million by Medicare for rendering home healthcare services to Medicare beneficiaries. Of those claims, referrals from

PHYSICIAN 1 and PHYSICIAN 2, accounted for approximately over $880,000 in submitted claims to Medicare and approximately $1 million in paid claims from Medicare.

20. From January 30, 2012 through April 26, 2016, DHS submitted claims under the name of PHYSICIAN 2.

21. Defendant JOYCE AGU would and did own Nutrend.

22. Defendant JOYCE AGU, on or about September 1, 2009, did indicate direct ownership of Nutrend, subsequently..

23. N.G. was the owner of Gregorio Healthcare, a medical clinic in Houston.  From October 2015 through October 2016, N.G. provided JOYCE AGU with the required paperwork to bill Medicare for home health agencies, which included Nutrend, for beneficiaries in the Houston, Texas and other known surrounding areas in Texas.  Any patient authorized by Gregorio Healthcare to receive home health by JOYCE AGU's Nutrend was the result of a kickback from JOYCE AGU.  N.G. received between $70 to $120 per patient via check from JOYCE AGU for the initial certification of home health or for the recertification of home health for a beneficiary.

24. N.G., who is not a licensed physician, would conduct a medical evaluation of the beneficiary to establish a plan of care.  The plan of care would generate a 485, to which N.G., would have PHYSICIAN 1 sign the 485, certifying and recertifying beneficiaries to home health for Nutrend.

25. Defendant JOYCE AGU would and did bill Medicare on behalf of Nutrend for home health services to beneficiaries where they did not qualify or receive the services.

26. From January 2012 to August 2017, Nutrend submitted claims to Medicare in excess of $4.9 million and was paid approximately $2.6 million by Medicare for rendering home healthcare

services to Medicare beneficiaries. Of those claims, referrals from PHYSICIAN 1 and PHYSICIAN 2, accounted for approximately over $897,000 in submitted claims to Medicare and accounted for approximately $460,000 in paid claims from Medicare.

27. From July 13, 2016 through April 20, 2017, Nutrend submitted claims under the name of PHYSICIAN 1.

28. From August 20, 2012 through August 30, 2016, Nutrend submitted claims under the name of PHYSICIAN 2.

29. Defendant JOYCE AGU would and did have signing authority on Wells Fargo Bank account ending in *5394.

30. On or about April 26, 2010, the defendant JOYCE AGU, submitted an Electronic Funds Transfer Authorization Agreement to Medicare for the purpose of designating Wells Fargo Bank checking account number ending in *5394 as the account authorized to receive the direct deposit of Medicare payments for services allegedly performed by DHS.

31. From on or about January 2012 through on or about May 2018 the defendant JOYCE AGU would and did submit to Medicare for DHS over $2.5 million in claims for home health services and was paid over $2.8 million into DHS Wells Fargo Bank account ending in *5394.

32. Defendant JOYCE AGU would and did have signing authority on Frost Bank account numbers ending in *1922 and *3221.

33. An Electronic Funds Transfer Authorization Agreement was submitted to Medicare for the purpose of designating Frost Bank checking accounts ending in *1922 and *3221 as the accounts authorized to receive the direct deposit of Medicare payments for services allegedly performed by Nutrend.

34. From on or about January 2012 through May 2018 the defendant JOYCE AGU would and did submit approximately $5.1 million in claims to Medicare for Nutrend for home health services where Medicare paid approximately $2.8 million into Nutrend's Frost Bank accounts ending in *1922 and *3221 for these services.

## C.  COUNTS TWO THROUGH SIX
### Health Care Fraud
### (18 U.S.C. §§ 1347 and 2)

### Introduction

At all times material to this Indictment:

35. Paragraphs 1 through 8 of this Indictment are realleged and incorporated as though fully set forth therein.

36. Beginning in or about January 2012 through in or about May 2018 the defendant JOYCE AGU caused to be billed, and aided and abetted the billing of, Medicare, for services which were either not performed or were not medically necessary.  As a result of this unlawful scheme, Medicare paid in excess of $5.6 million based on the false and fraudulent claims submitted by DHS and Nutrend.

### Purpose of the Scheme to Defraud

37. It was a purpose of the scheme to defraud that the defendant and others known and unknown to the Grand Jury unlawfully enrich themselves by falsely and fraudulently representing to Medicare that certain services and procedures were performed for Medicare beneficiaries when in fact the defendant knew the beneficiaries did not properly qualify for the services or the services were not performed.

**Manner and Means**

38. The Grand Jury re-alleges and incorporates by reference as if fully alleged herein the Manner and Means alleged in paragraphs 12 through 34 of Count One of this Indictment.

**Health Care Fraud**

39. Beginning in or about January 2012, and continuing thereafter to in or about May 2018, in the Houston Division of the Southern District of Texas and elsewhere, defendant

**JOYCE AGU**

aided and abetted by others known and unknown to the grand jury, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of material, false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, to wit; on or about the below listed dates, the defendant listed caused to be submitted false and fraudulent claims to Medicare:

| Count | Patient Initials | Claim Number | Approximate Date of Submission | Approximate Paid Date | Approximate Amount Billed | Approximate Amount Paid | Nature of the Falsity included but not limited to |
|---|---|---|---|---|---|---|---|
| 2 | B.F. | 21532901529407 TXR | 12/17/2015 | 12/31/2015 | $1,350.01 | $1,857.37 | Did not qualify |
| 3 | B.F. | 21609801818807 TXR | 4/7/2016 | 4/21/2016 | $3,450.01 | $3,616.07 | Did not qualify |

| 4 | B.F. | 21622801690107 TXR | 8/15/2016 | 8/29/2016 | $1,050.01 | $1,781.03 | Did not qualify |
| 5 | M.S. | 21628802757907 TXR | 10/14/2016 | 10/28/2016 | $2,000.01 | $2,433.09 | Did not qualify |
| 6 | M.S. | 21636502073307 TXR | 12/30/2016 | 1/13/2017 | $1,300.01 | $2,433.09 | Did not qualify |

All in violation of Title 18, United States Code, Sections 1347 and 2.

**D. COUNT SEVEN**
**Conspiracy to Pay and Receive Kickbacks**
**(18 U.S.C. § 371)**

40. The Grand Jury re-alleges and incorporates by reference as if fully alleged herein

paragraphs 1 through 8 of this Indictment.

41. Beginning in or about March 2014, and continuing thereafter to in or about October 2016, in

the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**JOYCE AGU**

did knowingly and willfully combine, conspire, confederate and agree with others known

and unknown to the grand jury, to commit and abet certain offenses against the United States,

namely:

a.  to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly

and willfully soliciting and receiving remuneration, specifically, kickbacks and

bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

b. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, and leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## OBJECT OF THE CONSPIRACY

42. It was the object of the conspiracy that the defendant and others known and unknown to the Grand Jury unlawfully enrich themselves by paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries for whom DHS and Nutrend would submit claims to Medicare.

## MANNER AND MEANS OF THE SCHEME AND ARTIFICE TO DEFRAUD

43. The Grand Jury re-alleges and incorporates by reference as if fully alleged herein the Manner and Means alleged in paragraphs 12 through 34 of Count One of this Indictment.

## **OVERT ACTS**

44. In furtherance of the conspiracy, and to effect the objects thereof, the defendant and others known and unknown to the Grand Jury, performed, among others, the overt acts as set forth below, were committed in the Southern District of Texas:

45. In or about October 20, 2014, defendant JOYCE AGU caused DHS to issue check number 2645 from its Wells Fargo account ending in *5394 payable to QC in the amount of $2,105.00.

46. In or about August 10, 2015, defendant JOYCE AGU caused DHS to issue check number 2955 from its Wells Fargo account ending in *5394 payable to S.B. in the amount of $700.00.

47. In or about April 21, 2016, defendant JOYCE AGU caused DHS to issue check number 3193 from its Wells Fargo account ending in *5394 payable to N.G. in the amount of $3250.00.

48. In or about March 24, 2015, defendant JOYCE AGU caused Nutrend to issue check number 2662 from its Frost Bank account number ending in *3221 payable to QC in the amount of $1537.50.

49. In or about August 10, 2015, defendant JOYCE AGU caused Nutrend to issue check number 2871 from its Frost Bank account number ending in *3221 payable to S.B. in the amount of $2,500.00.

50. In or about September 9, 2016, defendant JOYCE AGU caused Nutrend to issue check number 3418 from its Frost Bank account number ending in *3221 payable to N.G. in the amount of $1,200.00.

All in violation of Title 18, United States Code, Section 371.

### E.  COUNTS EIGHT THROUGH ELEVEN
**Payment of Health Care Kickbacks**
**(42 U.S.C. § 1320a-7b(b)(2), 18 U.S.C. § 2)**

51. Paragraphs 1 through 8 of this Indictment are realleged and incorporated as though fully set forth therein.

52. On or about the dates enumerated below, in the Houston Division of the Southern District of Texas and elsewhere, the defendant,

### JOYCE AGU

as set forth below, aiding and abetting others known and unknown to the Grand Jury, did knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in exchange for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare and by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishings and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare:

| COUNT | DATE | APPROXIMATE PAYMENT | RECIPIENT |
|---|---|---|---|
| 8 | September 22, 2016 | $2,707.20 | N.G. |
| 9 | July 29, 2016 | $3,913.65 | N.G. |
| 10 | September 9, 2016 | $1,200.00 | N.G. |
| 11 | October 27, 2016 | $720.00 | N.G. |

All in violation of Title 42, United States Code, Section l320a-7b(b)(2) and Title 18, United States Code, Section 2.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(7))

53. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice to

the defendant,

### JOYCE AGU

that upon conviction of any of the Counts alleged in this Indictment, all property, real and

personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable

to such offenses, is subject to forfeiture.

### Money Judgment

54. Defendant is notified that upon conviction, a money judgment may be imposed equal to the

total value of the property subject to forfeiture.

### Substitute Assets

55. Defendant is notified that in the event that one or more conditions listed in Title 21, United

States Code, Section 853(p) exists, the United States will seek to forfeit any other property of

the defendant up to the total value of the property subject to forfeiture.

Original Signature on File

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY


By: /s/ Rodolfo Ramirez
      Rodolfo Ramirez
      Assistant United States Attorney